IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JENNIFER CONKLIN,
     Plaintiff,

vs.                          Case No.: 3:15cv191/MCR/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## I.   PROCEDURAL HISTORY

On October 22, 2011, Plaintiff filed an application for DIB, and in the application she alleged disability beginning April 1, 2009 (Tr. 13).[1] Her application was denied initially and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing was held on August 21, 2013, and on December 9, 2013, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (Tr. 13–29).  On February 25, 2015, the Appeals Council denied Plaintiff's request for review (Tr. 1).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

## II.   FINDINGS OF THE ALJ

On December 9, 2013, the ALJ made several findings relative to the issues raised in this appeal (Tr. 13–29):

1)     Plaintiff last met the insured status requirements of the Act on December 31, 2012;

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on July 29, 2015 (ECF No. 10).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

Case No. 3:15cv191/MCR/EMT

2)     Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2009, through her date last insured of December 31, 2012;[2]

3)     Through the date last insured, Plaintiff had the following severe impairments: systemic lupus erythematosus with arthralgias, fibromyalgia, Raynaud's syndrome, obesity, and depression;

4)     Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1;

5)     Through the date last insured, Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b).  She could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  She could sit for six hours and stand and/or walk for six hours in an eight-hour workday.  She could occasionally climb ramps/stairs, but was unable to climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch, or crawl.  She was to avoid extremes in temperatures and avoid dust, fumes, and gases.   She had residual psychological symptoms resulting in the need for simple, repetitive, tasks with short simple instructions;

6)     Plaintiff has no past relevant work;

7)     Plaintiff was born on December 15, 1974, and was 38 years old, which is defined as a younger individual aged 18–49, on the date last insured;

8)     Plaintiff has at least a high school education and is able to communicate in English;

_____

[2] Plaintiff initially alleged an onset date of March 12, 2011 (Tr. 176), then amended it to April 1, 2009 (Tr. 178).  She now concedes, however, that the evidence "likely does not support an onset in 2009" (ECF No. 14 at 2 n.1).  Thus, the time frame relevant to this appeal is April 1, 2009 (alleged onset) to December 9, 2013, date of ALJ decision (date last insured), but the main focus of the court's inquiry will begin at the March 12, 2011, date.

9)    Transferability of job skills is not an issue because Plaintiff has no past relevant work;

10)    Through the date last insured, considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed;

11)    Plaintiff was not under a disability, as defined in the Act, at any time from April 1, 2009, the alleged onset date, through December 31, 2012, the date last insured.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole

the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, she is not disabled.

2.    If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.    If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.    Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052

(11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

A.   Personal History

Plaintiff testified at the August 21, 2013, hearing as follows.  She described her symptoms of lupus as causing joint pain in her hands, arms and feet, frequent respiratory infections and fevers, and pneumonia which leads to pleurisy two or three times per year (Tr. 43–44).  She also stated that it caused her fatigue such that she would have to rest or take a nap every day and that it caused "a lot of memory issues" or bouts of "lupus fog," where for instance she would completely forget how to get home (Tr. 44, 46, 53).

Plaintiff stated that she can walk five to ten minutes at a time, stand for ten minutes, sit for thirty to forty-five minutes before she needs to stretch, and while she estimated that she can lift ten to fifteen pounds, she could not remember any doctor limiting how much she should lift (Tr. 47–48).  She testified that she sometimes picks up her child, who weighs approximately 40 pounds, to help her into her car seat and that she does light grocery shopping but usually gets assistance with both loading and unloading the bags and is exhausted when she is finished (Tr. 48, 51–52).  She stated

that she drives three or four times per week (Tr. 48–49).  She can climb stairs; stoop, squat, and bend over to pick up objects; grip a coffee cup or doorknob; pick up small items such as a pen; make a simple meal; bathe and dress herself; and comb her hair. She sometimes does the laundry with help from other family members, sweeps the floor, and while she does rudimentary cleaning, she cannot keep up with all the housework (Tr. 49–50).  She provided that, other than taking her child to school or going to a doctor's appointment, she goes out to meet someone approximately once per week (Tr. 50).  She stated that exposure to the sun exacerbates her pain and fever symptoms (Tr. 54).  Plaintiff stated that her ability to sit at a desk is limited to about fifteen minutes, and her ability to work at a computer is limited to about five minutes because of the pain in her hands (Tr. 52).  Finally, she testified that, because of her pain and her need to nap every day, she does not believe she could return to work, and she sometimes cannot watch over her child (Tr. 55–56).

> B.     Relevant Medical History

Plaintiff's medical history reveals the following medical visits.  Plaintiff was seen at the High Rock Internal Medicine facility ("High Rock") on January 12, 2009, after experiencing coughing and wheezing for the previous two weeks (Tr. 290).  She was not seen as in acute distress and was diagnosed with acute bronchitis for which medication was provided (Tr. 290–91).  Plaintiff again presented on July 30, 2009,

with the same symptoms, plus sinus pressure around her eyes (Tr. 292). She was diagnosed with acute maxillary sinusitis and again provided medication (Tr. 293). Plaintiff was again seen on October 25, 2009, reporting nausea and chest congestion (Tr. 296), and on November 19, 2009, reporting congestion and sinus issues as well as lower back pain (Tr. 298).

In March of 2011, Plaintiff presented with myalgia and fatigue (Tr. 302). She was tested with a rheumatology panel which revealed a "weakly positive" ANA titer (Tr. 301). On April 15, 2011, Plaintiff underwent a chest x-ray which revealed right upper lobe pneumonia (Tr. 330). On May 24, 2011, another x-ray was taken, which found both lungs to be clear (Tr. 312).

On September 23, 2011, Lisa G. Criscione-Schreiber, M.D., a rheumatologist, evaluated Plaintiff for possible systemic lupus erythematosus ("lupus" or "SLE") (Tr. 333–38). Dr. Schreiber noted Plaintiff's reported symptoms indicative of SLE such as nasal and oral ulcers, alopecia, substantial chest pain with burning when she took deep breaths, and pneumonia (Tr. 333). It was also noted that, after prednisone was prescribed, her symptoms all improved, but as she tapered off the medication her pain began to return (id.). Noting her family history of SLE, her positive ANA reading, and other signs and symptoms that were strongly suggestive of SLE, Dr. Schreiber

thought it was clear Plaintiff was developing early lupus. It was recommended that Plaintiff begin treatment with hydroxychloroquine (Tr. 335).

On October 3, 2011, Plaintiff was seen at High Rock for episodic chest pains and dyspnea (Tr. 307).  On physical examination, her chest was clear, her heart had a regular rate and rhythm, an electrocardiogram showed normal results, and Plaintiff did not appear in acute distress (Tr. 308).

On October 13, 2011, Plaintiff visited the Wake Forest Baptist Medical Health Center, again complaining of chest pain, difficulty breathing, and diaphoresis (Tr. 287).  On physical examination, she was in no respiratory distress, her breathing was normal, and she had a normal heart rate and rhythm (Tr. 288).  A chest x-ray and ECG test were both returned with normal results (Tr. 282, 288).  The clinical impression was possible pericarditis with atypical chest pain (Tr. 288).

On January 25, 2012, Plaintiff underwent a disability examination with George Osei-Bonsu, M.D. (Tr. 345–49).  Plaintiff complained of joint pain, chest pain, and fatigue to the point of sleeping all day (Tr. 345).  Dr. Osei-Bonsu diagnosed her with joint pain in multiple sites and with SLE.  The results of his physical examination reported costochondral tenderness and a mild antalgic gait, but otherwise Plaintiff was able to stand, squat and rise, raise her arms overhead, and use full grip strength (Tr.

347).    She  had  clear  lungs  and  a  regular  heart  rate,  and  her  musculoskeletal

examination revealed no obvious joint swelling, redness, effusion, or tenderness (*id.*).

On March 13, 2012, Plaintiff was again seen at High Rock for a persistent

cough (Tr. 399).  She was assessed with acute bronchitis, SLE which was stabilized,

and shortness of breath (Tr. 400).  On March 16, 2012, a chest x-ray was obtained

which showed no acute abnormality (Tr. 398).

On May 11, 2012, Megan E. Clowse, M.D., saw Plaintiff at the Duke Lupus

Clinic (Tr. 363–70).  Dr. Clowse continued her medication for her SLE, 400mg of

hydroxychloroquine, noting that she had not been on that dosage level for very long

(Tr. 369).  She noted Plaintiff's more recent complaint of significant pain in the small

joints of her hands, but also diffusely, and while she noted that Plaintiff presented as

being in a lot of pain, Dr. Clowse's physical examination did not reveal many signs

of tenderness or synovitis (*id.*).

On February 3, 2012, Plaintiff underwent a psychological evaluation by

psychologist Dr. Joseph Appollo, who diagnosed Major Depressive Disorder, Single

Episode, moderate, and Cognitive Disorder, and he noted that major depression also

needed to be ruled out (Tr. 355–56).  During the evaluation, Dr. Appollo found

Plaintiff to be cooperative and pleasant with normal pace and clarity, coherent

thoughts, and below average memory recall.  Dr. Appollo noted that her intellectual

functioning appeared lower than in the past.  He assessed her with low average ability to understand, retain, and follow instructions; limited ability to sustain attention to perform simple repetitive tasks; limited ability to relate to others; and marked problems in the ability to tolerate stress and pressure associated with day-to-day work activity (Tr. 355).

On a September 7, 2012, follow-up visit for her SLE, Plaintiff was seen by Nurse Practitioner Michele M. Cerra (Tr. 477–79).  Plaintiff had been initiated on methotrexate to address her joint pain, but she reported that she discontinued it due to her symptoms of nausea and depression (Tr. 478).  After discontinuing it, she experienced an increase in joint pain, as well as stiffness in the morning for about an hour (*id*.).  Plaintiff also complained of severe daily fatigue (*id*.).  Nurse Cerra switched her to subcutaneous injections of methotrexate in an attempt to alleviate her symptoms (Tr. 479).

On October 30, 2012, Plaintiff was seen by Steven S. Hsieh, M.D., at High Rock (Tr. 515–17).  Plaintiff reported that she was not taking her methotrexate, but she also stated that her SLE symptoms had improved (Tr. 515).  She reported significant current stress because of a terminal illness in the family.  Her physical examination was essentially normal, and she was continued on her current medications (Tr. 515–16).

On February 20, 2013, Plaintiff was seen by Michael K. VandenBerg, M.D., for multiple musculoskeletal complaints, which at the time were "low-grade" (Tr. 532). Dr. VandenBerg assessed her with SLE and also suspected she might have fibromyalgia, for which he switched her medication to Cymbalta (Tr. 533).  Plaintiff returned to Dr. VandenBerg on March 20, 2013, complaining that the Cymbalta was making her dizzy.  Dr. VandenBerg discontinued the Cymbalta and started her on Gabapentin (Tr. 531).

On May 2, 2013, Plaintiff was seen by Andrew VanBrocklin, D.O., complaining of pain in her joints, but primarily in her upper and lower back (Tr. 523). Plaintiff described her pain as continuous, sharp, and burning, and she stated it reduced her ability to do housekeeping and shopping (*id.*).  Her musculoskeletal examination exhibited normal range of motion without pain.  She was prescribed Norco and advised to stretch and walk (Tr. 526–27).

On June 12, 2013, Plaintiff was again seen by Dr. VandenBerg.  She reported fatigue and stated that she stopped her Gabapentin medication because it was making her feel tired (Tr. 529).  A physical examination revealed no abnormalities.  Dr. VandenBerg discontinued Plaintiff's Flexeril and reduced her Norco to see if that would alleviate her tiredness (Tr. 529).

On September 11, 2013, Plaintiff underwent a consultative physical examination with Richard D. Hawthorne, D.O., who identified SLE, fibromyalgia, and Raynaud's disease in her medical history (Tr. 557).  Dr. Hawthorne found paraspinal hyperspasticity in the lumbar and thoracic spinal areas but otherwise found her respiratory system to be clear, her range of motion to be normal in all her extremeties, and her heart to have normal rhythm (Tr. 558).  Dr. Hawthorne also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form, in which he found Plaintiff able to lift and carry 11 to 20 pounds continuously, 21 to 50 pounds frequently, and 51 to 100 pounds occasionally (Tr. 562).  He determined that she could sit for eight hours at a time or for four hours during an eight-hour day, that she could stand for eight hours at a time or for two hours during an eight-hour day, and that she could walk for eight hours at a time or for two hours during an eight-hour day (Tr. 563).  He also determined that Plaintiff was capable of frequently using her hands for reaching overhead, and for handling, fingering, feeling, pushing and pulling, and using foot controls (Tr. 564).  He found that she could continuously climb stairs and ramps and frequently climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl (Tr. 565).  Finally, he found that she could tolerate only occasional exposure to extreme cold (Tr. 566).

Nurse practitioner Darcy Johnson-Leonard, CRNP, completed a Physical Capacities Evaluation form for Plaintiff on August 27, 2012 (Tr. 543–49).  She found Plaintiff able to only occasionally lift or carry up to 10 pounds and never able to lift anything heavier (Tr. 544).  She found Plaintiff capable of sitting for one hour and standing or walking less than one hour total during an entire eight-hour day, and she indicated that Plaintiff would need an opportunity to alternate sitting and standing at will throughout the day (Tr. 543).   Nurse Johnson-Leonard indicated that Plaintiff could adequately use her hands for simple grasping, pushing and pulling, fine manipulation, and repetitive motion tasks such as writing, typing, and assembling (*id*.).   Plaintiff was also found able to use her feet for repetitive motions such as operating foot controls (*id*.).   While Nurse Johnson-Leonard provided that Plaintiff could occasionally climb, balance, and reach above the shoulder level, she indicated that Plaintiff could never stoop, kneel, crouch, or crawl (Tr. 544).  Plaintiff was also noted to have severe restriction against exposure to marked changes in temperature and humidity as well as dust, fumes, and gases (*id*.).  Nurse Johnson-Leonard further indicated that Plaintiff suffers from fatigue derived from a "reasonable medical basis," SLE, which prevents her from working full-time, even in a sedentary position (*id*.).

On September 7, 2012, Nurse Practitioner Michele Cerra also completed a Physical Capacities Evaluation form for Plaintiff (Tr. 550–55).[3]  She found Plaintiff capable of sitting for one hour and standing or walking for less than one hour total during an eight-hour day and needing an opportunity to alternate between sitting and standing throughout the day (Tr. 550).  Nurse Cerra stated that Plaintiff could use her hands adequately for simple grasping pushing and pulling, fine manipulation, and the repetitive motion tasks of writing, typing, and assembly, and that she could use feet for repetitive movements as in operating foot controls (*id.*).  She indicated Plaintiff could only occasionally lift or carry up to ten pounds but never more than that, and that Plaintiff could occasionally climb, balance, or reach above her shoulders but never stoop, kneel, couch, or crawl. (Tr. 551).  Plaintiff was assessed with a severe restriction from activities involving exposure to marked changes in temperature and humidity and exposure to dust, fumes, and gases.  Nurse Cerra indicated that Plaintiff suffered from fatigue based on her SLE (*id.*).  She also stated that Plaintiff suffered from pain, the mental effects of which would result in a significant handicap with sustained attention and concentration that would eliminate her ability to do skilled

---

[3]  The parties are in agreement that, although the ALJ stated that Dr. Megan Clowse had completed these forms, as they were sent to her by Plaintiff's former counsel in this case, it was actually Nurse Cerra who signed the forms and therefore evidently completed them (*see* ECF Nos. 14 at 5–6, 15 at 9 n.4).

work tasks (Tr. 553).  In sum, Nurse Cerra concluded that Plaintiff suffered from both fatigue and pain such that they would prevent her from working full-time, even in a sedentary capacity (Tr. 552).

On the same date, Nurse Cerra also completed a form stating that, since September 23, 2011, the date of her first examination of Plaintiff, Plaintiff was diagnosed with SLE such that she was unable to engage in full-time work activity (Tr. 554–55).  Nurse Cerra's findings were based on her assessments of Plaintiff as having at least moderately severe levels of respiratory symptoms (pleurisy) and dermatologic symptoms (malar rash, Raynaud's Syndrome, and nasal/oral ulcers) (Tr. 554).  She identified her with constitutional symptoms of malaise and severe fatigue and found Plaintiff to have marked levels of limitation as to: activities of daily living; maintaining social functioning; and completing tasks in a timely manner due to deficiencies in concentration, persistence and pace (Tr. 555).

State Agency physician Frank Virgili, M.D., completed a Disability Determination Explanation and Physical Residual Functional Capacity Assessment on May 3, 2012 (Tr. 87–101).  Dr. Virgili found Plaintiff able to lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk with normal breaks for a total of about six hours in an eight-hour workday; and sit with normal breaks for a total of about six hours in an eight-hour workday (Tr. 96).  He found that she was not

limited in her ability to push or pull both hand or foot controls; that she could frequently climb stairs and ramps; but that she could only occasionally climb ladders, ropes, or scaffolds (*id*.).  Dr. Virgili found that Plaintiff could frequently stoop, kneel, crouch and crawl, but only occasionally balance (*id*.).

## V.     DISCUSSION

Plaintiff's first claim is that the ALJ failed to consider whether she met the criteria for the Listing 14.02, which pertains to SLE.

The Listing of Impairments contains impairments that are deemed severe enough to prevent an individual from performing gainful activity regardless of age, education, or work experience.  20 C.F.R. § 404.1525(d); <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1224 (11th Cir. 2002).  "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532, 110 S. Ct. 885, 892, 107 L. Ed. 2d 967 (1990).  Plaintiff has the burden of proving that her impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria.  *Id.* at 530.  "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and

the duration requirement.  *See* 20 C.F.R. § 404.1525(a)–(d).  To 'equal' a Listing, the

medical findings must be 'at least equal in severity and duration to the listed findings.'

*See* 20 C.F.R. § 404.1526(a)."  Wilson, 284 F.3d at 1224; *see also* Shinn ex rel. Shinn

v. Comm'r, 391 F. 3d 1276, 1282 (11th Cir. 2004).

Meeting Listing 14.02 for SLE requires:

A. Involvement of two or more organs/body systems, with:

    1. One of the organs/body systems involved to at least a moderate level of severity; and

    2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

Or

B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

    1. Limitation of activities of daily living.

    2. Limitation in maintaining social functioning.

    3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

*See* 20 C.F.R. pt. 404, subpt. P, app. 1, Listing of Impairments § 14.02; Sanderlin v.

Comm'r of Social Sec., No. 2:14-cv-484-FTM-CM, 2015 WL 3627263, at *6 (M.D.

Fla. Jun. 10, 2015).

Plaintiff contends that this listing is met essentially through the findings of Nurse Cerra, who concluded that Plaintiff met subsection A.1. (moderately severe respiratory and dermatologic symptoms) and subsection A.2. (malaise and severe fatigue); and met subsection B. (marked limitations on activities of daily living, maintaining social functioning, and completing tasks in a timely manner due to deficiencies in concentration, persistence and pace).  Plaintiff asserts that Nurse Cerra's findings are supported by the medical record which documents her frequent symptoms and complaints as to these symptoms.

As Defendant points out, however, the medical record refutes this degree of severity:

> Notably, on examination, Plaintiff most often had no respiratory distress, clear lungs, and unlabored breathing (Tr. 288, 293–94, 296, 299, 301, 303, 305-06, 308, 311, 327, 335, 365, 369, 375, 390, 393, 396, 400, 403, 408, 411, 429, 453, 516, 525, 529, 558).  The record shows she had pneumonia once in May 2011 (Tr. 306), and bronchitis about once a year (Tr. 291, 297, 304, 400, 405).  She also had one episode of pleurisy in Spring 2011 (Tr. 500), but the record shows it responded to medication (Tr. 365, 440, 489, 529, 531, 532–33).  Also, while Plaintiff complained of occasional mouth or nasal ulcers and "mild" malar rash (Tr. 335, 363, 369, 429, 438), Plaintiff's examinations most often showed no nasal or oral ulcers and warm, dry skin, with no rashes (Tr. 288, 291, 293, 295, 297, 299, 302–04, 306, 308, 311, 325–26, 365, 375, 390, 393, 396, 403, 405, 408, 411, 429, 440, 453, 516, 529, 532–33).  As with her pleurisy, Plaintiff's rash and ulcer symptoms improved with medication (Tr. 310, 333, 392, 399, 402, 407, 410, 529, 532).
>
> . . .

> While Plaintiff frequently complained of fatigue to her treating sources, she did not specifically complain of malaise (Tr. 350, 404, 429, 478).
>
> . . .
>
> . . . Plaintiff notes she sometimes complained of chest pain, headaches, fever, coughing, wheezing, and joint and body pain . . . . A physician noted in April 2012, that Plaintiff complained of no undue malaise and did not indicate it significantly reduced her physical or mental function (Tr. 375). Further, while physicians assessed Plaintiff with fatigue and noted a few times that she appeared fatigued (Tr. 302, 365, 405, 429, 478), Plaintiff fails to show a physician specifically assessed her with malaise (Pl.'s Br. at 6–7). Indeed, treating sources often observed she appeared in no acute distress at examinations (Tr. 290, 292, 296, 301, 303, 305, 308, 311, 325–26, 328, 334, 347, 365, 369, 375, 390, 393, 396, 400, 403, 408, 411, 429, 440, 453, 516). Further, as to Plaintiff's fatigue, Plaintiff reported at times that it was "mild" (Tr. 301, 404) and sometimes denied fatigue (Tr. 524, 557).

(ECF No. 15 at 6–8).

The court has reviewed the relevant parts of the record and concurs with Defendant's overall description. As a whole, the record is bereft of the type of medical interventions or courses of treatment that would suggest that Plaintiff's impairments were severe enough to qualify under Listing 14.02. This is especially so given the fact that Plaintiff has for the most part responded satisfactorily to medications and treatment.

More important, as Plaintiff recognizes, the findings of a nurse practitioner such as Nurse Cerra do not qualify as findings from an "acceptable medical source" for the purposes of providing medical opinions to establish the existence of a medically

determinable impairment.  *See* 20 C.F.R. § 404.1513.  Further, only acceptable medical sources may provide "statements . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  *See* 20 C.F.R. §§ 404.1527(a)(2), 404.1513; *see also* Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir. 1998) (permitting an ALJ to assign less weight to chiropractors and other nonmedical doctors than to medical doctors).  Nonetheless, a non-acceptable medical source may provide useful evidence regarding the severity of an impairment or how it affects a claimant's functional abilities.  Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *1–2 (S.S.A. Aug. 9, 2006).  In fact, in situations it may be appropriate to give greater weight, even more weight than a treating source, to the opinion of a non-acceptable medical source who has seen the individual more often, has provided better supporting evidence, and/or has a better explanation for his or her opinion.  *Id.*

Nurse Cerra's opinions do not merit greater weight under the above guidelines.  First, her opinions do not appear consistent with her own treatment notes, which recognized that Plaintiff was not working at the time but expressed no overriding concern about her current medical status and related treatment options.  Moreover, many of Nurse Cerra's conclusions as to Plaintiff's disability, such as being unable

to sit or walk for more than one hour or her inability to ever lift more than 10 pounds, are simply not born out in the medical record nor her own notes in particular.  Finally, her medical assessments, provided as they are on prefabricated forms with check-boxes, do not provide persuasive evidence of the validity of the opinions expressed therein.  *See, e.g.*, Hammersley v. Astrue, No. 5:08cv245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions.") (citing Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions)).

Plaintiff also argues that, because the ALJ did not articulate any finding that as to whether Plaintiff met listing 14.02, and none can be inferred, reversal is warranted on this basis.  As Plaintiff acknowledges, however, no specific finding is necessary so long as the ALJ's finding may be fairly implied from the record.  *See* Davenport v. Astrue, 403 F. App'x 352, 354 (11th Cir. 2010) (affirming ALJ's implicit determination that plaintiff did not meet or equal a listing); Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986).  While the ALJ did not make any specific findings related to Listing 14.02, that the ALJ found she did not meet the listing is implicit

from her discussion of the medical record, opinions of the physicians, and Plaintiff's own reporting of her activities and abilities. Moreover, the only relevant finding that was in Plaintiff's favor belonged to Nurse Cerra whose opinions are not qualified and were justifiably given only limited weight by the ALJ (Tr. 24–25). Accordingly, Plaintiff fails to show that she met the requirements of Listing 14.02 or that the ALJ erred by not specifically articulating a finding against her in that regard.

The court finds it expedient to combine Plaintiff's remaining three grounds into the same discussion. In her second ground, Plaintiff contends that the ALJ's determination of her residual functional capacity ("RFC") to perform light work was not supported by substantial evidence, specifically in that her determination did not sufficiently account for Plaintiff's non-exertional impairments, namely, the pain and fatigue associated with her SLE and fibromyalgia. In her third ground, Plaintiff contends that the ALJ erred by assigning only limited weight to the two nurse practitioners who rendered opinions as to the severity of Plaintiff's impairments. In her fourth and final ground, Plaintiff asserts that the ALJ improperly discredited her testimony regarding the extent to which her impairments affected her daily activities and her physical abilities.

The RFC assessment should be informed by medical impairments and symptoms. Such symptoms, including pain, are not themselves exertional or

nonexertional, but rather it is the functional limitations or restrictions they cause that are categorized as exertional or nonexertional.  SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  To establish disability based on testimony concerning pain or other subjective symptoms, a three-part "pain standard" must be satisfied.  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  That is, a claimant must first show evidence of an underlying medical condition and then either (a) objective medical evidence that confirms the severity of the alleged pain stemming from that condition, or (b) that the objectively determined medical condition is so severe that it can reasonably be expected to cause the alleged pain.  *Id.*; *see also* Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (stating that this "standard also applies to complaints of subjective conditions other than pain").

When medical signs and laboratory findings establish that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate the intensity and persistence of the claimant's symptoms and the extent to which those symptoms limit the claimant's capacity for work.  20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).[4]  In so doing, the ALJ is to consider the objective medical

_____

[4] SSR 96-7p was superseded by SSR 16-3P, 2016 WL 1119029 (S.S.A. Mar. 16, 2016).  SSR 96-7p was in effect at the time of the ALJ's December 9, 2013, decision.

evidence and other evidence provided by the claimant and her treating and non-treating sources concerning what may precipitate or aggravate her symptoms; what medications, treatment, or methods are used to alleviate the symptoms; and how the symptoms affect the claimant's daily living.  20 C.F.R. § 404.1529(c)(3).  The ALJ's credibility finding must be grounded in the evidence and contain specific reasons that are supported by the record evidence.  SSR 96–7p, 1996 WL 374186, at *4; Hale, 831 F.2d at 1011.  A claimant's credibility should also be evaluated with regard to the individual's own statements about symptoms and with regard to statements from treating or examining physicians or psychologists, and other persons about the symptoms and how they affect the claimant.  *See* SSR 96–7p, 1996 WL 374186, at *4.

Thus, while a lack of objective evidence is a factor that may properly be considered in discounting a claimant's complaints, it may not be the *only* basis for doing so.  *See* 20 C.F.R. § 1529(c)(2) ("we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements"); SSR 96–7p, 1996 WL 374186, at *3 (because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," an ALJ must consider other factors in addition to the objective medical evidence when

assessing the credibility of an individual's statements); 20 C.F.R. § 404.1529(c)(3).[5]

*See also, e.g.*, Cline v. Sullivan, 939 F.2d 560, 566 (8th Cir. 1991) ("an ALJ may not

base a denial of benefits solely on a lack of objective medical evidence") (citations

omitted).

      If the credibility of the claimant's subjective testimony is critical to the

decision, the ALJ must either explicitly discredit such testimony or the findings must

form a clear implication that amount to a specific discounting of the testimony.  Foote,

67 F.3d at 1561–62 (citing Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir.

1983)).  "A clearly articulated credibility finding with substantial supporting evidence

in the record will not be disturbed by a reviewing court."  *Id.* (citing MacGregor v.

Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986)).  It is within the ALJ's discretion to

determine that a plaintiff's claims of pain and other symptoms are not credible.  *See*

Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).

      In finding that Plaintiff had the RFC to perform light work, the ALJ thoroughly

surveyed the medical record (Tr. 21–23).  As suggested previously with regard to

---

     [5]  The following factors are cited in  20 C.F.R. § 404.1529(c)(3):  (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures used to relieve the pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

Plaintiff's first argument, these records reveal little to support her contention that she suffered from debilitating pain from medical problems that the ALJ overlooked in rendering her conclusions.  While Plaintiff did frequently complain of fatigue, joint pain, and chest pain during her medical visits, often the ongoing symptoms were the result of her discontinuation or alteration of her medication, and the visits usually resulted in some adjustment made to the medication strategy.  During these visits Plaintiff was able to display normal range of motion in her extremities; had a normal gait and the ability to stand, squat, sit and grip; had intact reflexes; was under no visible distress; and had a normal, healthy appearance.  There were little or no signs of edema or tenderness, her chest was clear, and her heart had a regular rate and rhythm.

The ALJ also cited to the medical opinions of Drs. Hawthorne and Virgili as part of her RFC determination.  She gave substantial weight to the opinion of Dr. Hawthorne regarding the extent of Plaintiff's impairments because it was consistent with Dr. Osei-Bonsu's earlier consultative examination and with the medical notes. The ALJ also found Dr. Hawthorne's report to be consistent with Plaintiff's subject reporting of her symptoms and conditions as well.  In fact, while Dr. Hawthorne concluded that Plaintiff would be capable of performing work at the medium to heavy levels of exertion, the ALJ afforded that portion of Dr. Hawthorne's opinion little

weight.  The ALJ stated that it was "not reasonable to assume that she can do this level of physical activity" but that exertion at the light exertional level was more in keeping with Plaintiff's diagnosis and the other evidence (Tr. 25).

The ALJ also gave some weight to Dr. Virgili's opinion, and, as with Dr. Hawthorne, the ALJ found that Plaintiff's impairments actually caused her to have less exertional capabilities than what Dr. Virgili assessed.  Thus, where Dr. Virgili stated that Plaintiff could frequently balance, stoop, kneel, crouch, crawl, and climb stairs and ramps, the ALJ found she could only occasionally do so, and where Dr. Virgili provided that Plaintiff could occasionally climb ladders, ropes, or scaffolds, the ALJ found that she could never do so (Tr. 25).

Thus the ALJ concluded "that no credible treating or consultative physician has opined that the claimant was disabled because of any physical and/or mental condition or from any resulting symptoms" (Tr. 24).  Plaintiff opposes this conclusion on grounds that the ALJ gave only "limited" weight to the medical conclusions drawn by Nurse Practitioners Johnson-Leonard and Cerra.[6]

---

[6] Plaintiff also asserts that the ALJ was impermissibly vague and ambiguous in her use of the term "limited weight" while evaluating the opinions of the nurse practitioners.  While this contention suggests that there are concrete terms that must be used by ALJs in these evaluations, the only such term that the court is aware of is the term "controlling weight," which is used in situations where a treating physician's opinion is to be wholly adopted.  *See* SSR 96-2p, 1996 WL 374188 (S.S.A. July 2, 1996); SSR 96-5p, 1996 WL 374183 (S.S.A. July 2, 1996).  Otherwise, the court finds no other specific nomenclature prescribed in the rules or regulations.  Moreover, numerous other courts have freely noted use of the term "limited weight" without questioning its meaning.

The ALJ gave limited weight to their opinions on grounds that they were inconsistent with the treatment records in the file which, as described above, indicate that Plaintiff was able to function adequately and engage in physical activity while on her medications once they were properly adjusted.[7] She also found the findings of the nurse practitioners to be inconsistent with Plaintiff's own reported activities. As discussed earlier, nurse practitioners are not acceptable medical sources of opinion evidence as to a claimant's impairments, and while their opinions may be used to gauge the severity of an impairment, the court finds the record evidence as a whole

See, e.g., Stultz v. Comm'r of Social Sec., 628 F. App'x 665, 668 (11th Cir. 2015) (noting use of the term "limited weight" in contradistinction to the term "substantial weight"); Henry v. Comm'r of Social Sec., 802 F.3d 1264, 1268 (11th Cir. 2015); Hacia v. Comm'r of Social Sec., 601 F. App'x 783, 786 (11th Cir. 2015); Choquette v. Comm'r of Social Sec., 695 F. Supp. 2d 1311, 1329 (M.D. Fla. 2010).

[7] The ALJ stated:

It is noteworthy that documentation of record does not contain any hospitalizations for the claimant for physical and/or mental health conditions since her alleged onset of disability. Nothing in the record suggests that the claimant's physical and/or mental impairments have been incapable of being alleviated or controlled with the proper and regular use of prescription medications. In fact, the record discloses that such medications have proven successful in assisting the claimant in maintaining control of her conditions and mitigating any accompanying symptomatology when taken as prescribed. The record contains no evidence of the claimant's ongoing difficulties with side effects of medication. When the claimant has complained of side effects, adjustments have been made to her medications or it has been discontinued.

(Tr. 26).

and the opinions of the other medical sources to be sufficient for the ALJ to have discounted the findings of the nurse practitioners.

Plaintiff also contends that the ALJ's findings discounting the credibility of her own subjective reporting of her impairments and their symptoms was in error. Plaintiff cites to three cases in support of her contention:  Lewis v. Callahan, 125 F.3d 1436, 1440–41 (11th Cir. 1997); Pitts v. Comm'r of Soc. Sec., No. 01-16397, slip op. at 8 (11th Cir. May 1, 2002); and Venette v. Apfel, 14 F. Supp. 2d 1307, 1314 (S.D. Fla. 1998).  However, in all three of these cases, the ALJ discredited the claimant's testimony—sometimes unfairly at that—against a medical record containing an opinion from treating physician that was consistent with the claimant's testimony.  In other words, these cases found fault with the fact that the ALJ had unfairly used the claimant's testimony regarding his or her daily activities to override the controlling weight that was or should have been afforded to the treating physician.  That situation does not exist here, as there is no treating physician who recommended  a finding of disability, or who recommended limitations consistent therewith.  As the undersigned has previously discussed, the ALJ properly found Plaintiff's subjective testimony regarding her symptoms and her daily activities non-credible to the degree they contravened the medical history and evaluations from physicians in the record.

Accordingly, there is substantial evidence in the record to show that Plaintiff, despite her allegations of pain and fatigue, was able to perform functional daily tasks, was able to manage her SLE and other impairments with medical help, and despite her limitations was medically determined to be capable of activity or movement synonymous with performance at the light exertional level.

For the foregoing reasons, the undersigned concludes that the ALJ's decision is adequately supported and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.

Accordingly, it is respectfully **RECOMMENDED**:

That the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida, this 29th day of August 2016.

/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**